John R. Littles. The President is not to be seen for 15 minutes outside. Good morning, Mark. Good morning, Congressman. Good morning, Your Honor. Mayor Morgan Lockhart here, and the appellant, Sam Anthony Tocco. Could you carry the microphone closer to you, Mr. Lockhart? Thank you, Your Honor. You might sort of direct it more toward your mouth and try to speak up for us. Should I repeat, though? I wanted three minutes for rebuttal. Thank you, Your Honor. In this particular matter, as the briefs show, this is an appeal regarding an action that was brought against a lawyer in a law firm for representations and writings that were made that the appellant relied upon. The way that this case actually transpired in lower court appears to me to look like immunity would be given in every case where a lawyer is involved because there certainly were numerous, almost uncountable representations that were made of fact, existing fact, and also of promises in the future, but on the basis of existing facts. Now, the attorney, Mr. Whittles, made so many statements and so many representations, both in writing and oral. I'll just read some of them. He stated that Mr. Zeta was the owner of more than sufficient funds to pay Mr. Tocco and all creditors. He also stated that Mr. Zeta was a beneficiary of a huge inheritance. He also stated that funds had been received and payment was delayed because of his advice, and it was in his trust account in two different places, in New York at one time and then just in his trust account. He also stated that they were in Richmond Greer's trust account ready for wire. On one occasion, he did it in writing, not just orally, that the funds were ready and wanted the street address and where they could be sent. He also stated that he would stake his and his firm's personal and professional reputation, that this was all true. He also stated that Mr. Zeta was now the owner of funds sufficient to pay everybody, and, in fact, stated even if he didn't have the inheritance which he has, that he had more than enough money to pay and then enumerated his assets, three huge homes, 120,000 square feet, three cars, jewelry and millions, all kinds of assets. And he stated that he had confirmed that his client was the owner of more than sufficient funds. He also said he confirmed authenticity of documents that he had gotten, which was not true. He hadn't confirmed documents. He hadn't done any due diligence at all, just made these representations. And then he continued and said he verified all his information and, in fact, traveled to Michigan to make those representations to a lawyer in 2008. That was Mr. Simjanovsky, that the monies were there and trust account would be dispersed. There was more than enough, even if it wasn't there, from the inheritance. He also, in countless writings, said he verified the documents that he had. He never verified them, never even looked at them, never even had them translated. They were in Arabic that he supposedly had. He also confirmed that he had an inheritance of $200 to $400 million, and the funds were awaiting transfer pending the release signatures. Mr. Whittles confirmed that. He also said that the funds were being domesticated in a New York bank account and that he had verified it. He also said that, specifically, I have done all my due diligence and I wouldn't put my firm and myself on the line if I didn't confirm it 100%. He also stated the funds were available, but Zeta would suffer substantial penalties from immediate payment at one point, when the money was in the trust account, and it was only delayed, he said, because of a problem with tax and that would be resolved very quickly. But the money was never in the trust account. Had Mr. Tocco known that there was no money in the trust account, there was no inheritance, that Mr. Whittles had not investigated, had not done his due diligence, he would have gone and gotten his money from all the assets at that time, which was in the name of Mr. Zeta. He also would have pursued liens that he had. He had taken out liens on portions of his assets, which were lost because it turned out he had given liens to other people, and were lost because after it was then decided that it was a farce and they went to suit, there was a receiver appointed and the assets were all gone to the receiver, despite the fact that a year before, had he not been told the money was in the trust account and that due diligence had been done, he would have pursued it at that time and collected his money. Perhaps you could address why it was reasonable for Mr. Tocco to rely on representations that were made to him by Mr. Zeta's lawyer. Well, first of all, Mr. Zeta's lawyer had been Mr. Tocco's lawyer. It is probably the reason why he was even picked to talk to Mr. Tocco. So Mr. Tocco knew that at that point in time he was representing Mr. Zeta, correct? Yes, Your Honor, he did. However, he also knew that he had faith in a person who had represented him previously. He also had faith in him for another reason why he would rely upon him, because he repeatedly said that I would not in any way cause a problem or do anything that would reflect upon my firm. A member of his firm was president of the Florida Bar. He relied upon the esteemed nature of his practice, the former president of the Florida Bar, and specifically said I would never, never cause myself or my firm to say something or do something that would cause us disgrace, and that you can rely upon us. Also, he relied upon him because he was not in an adversary position with him, because Mr. Whittles was only employed in order to facilitate payment, not in any type of adverse situation. So why wouldn't you believe him when he's in there only to facilitate payment? And that's what his purpose was, not in an adversary position because Mr. Zeta had other lawyers. Mr. Whittles wasn't brought in until the last year or so. What do you make of these Michigan cases that basically seem to be telling us that reliance is not reasonable as a matter of law when the person who is claimed to have been relied upon has an interest that's adverse to him? Well, first of all, you have to have an adverse interest. And if the person is only, Mr. Whittles, in that law firm, was only there as far as their client was concerned in order to facilitate payment, number two, he went outside the box of just giving an opinion or something. He actually became the forefront, and he traveled and, in fact, gave in writing existing facts. He does not have an adverse position, Mr. Whittles. There was no litigation. He was only there for an intermediary in order to facilitate payment. Certainly they were not, Mr. Tocco and Mr. Zeta were not in litigation at that time, but they certainly were in a position that was adverse to each other. Mr. Zeta owed Mr. Tocco money. Mr. Tocco wanted his money. And Mr. Whittles was, you know, Mr. Zeta's agent. He was his agent for facilitating payment, and you can commit fraud being an agent. I don't question that. I mean, certainly there's plenty of evidence in this record about representations that were made to Mr. Tocco. I just think there's some other difficulties with the case. Your Honor, you can go so far with something. You know, you can be in self-defense, but you can't go beyond self-defense. And in this particular instance, he went far beyond what he would do. He actually made guarantees. He just didn't give an opinion or say that this is the way something is or something will be. He actually guaranteed it. I did my due diligence. That's an absolute lie. He didn't do it, and he admitted that on the record in his own deposition. He also, and you can rely on somebody that says at least I did my own due diligence. You can rely on somebody, whether they're adverse or not, and he was not adverse because. . . I don't even, I think there's plenty of evidence from which one could find that Mr. Tocco did in fact actually rely on Mr. Whittles. But the question is whether this fact pattern can give rise to reasonable reliance pretty much as a matter of law. Well, as a matter of law, Your Honor, all you have to have is a dispute of fact, and it goes to a jury. The fact in this particular case is the Owinga case. The Owinga case was a person that would be more adverse than here. He represented, or the law firm there, and the person represented an insurance company. And he made statements that were not true regarding the insurance company in the Owinga case. And he was held responsible, and he was the attorney for the insurance company. That is Owinga v. Benistar, 694 Fed 3rd, 783 6th Circuit, 2012. And the defendant lawyers who represented the life insurance company provided oral and written representations and assurances. And in order to buttress the life insurance's representations and promises to plaintiff, and justifiable reliance was not negated, and the defendant lawyers were not entitled to summary judgment of plaintiff's state misrepresentation, including legal claims as well. They were not the defendant's lawyers in that case. Pardon me. Not the defendant's client. Owinga, arguably, well, which arose in the 12 v. 6 contest, arguably stands for the proposition that in the kind of situation, I guess it probably does stand for the proposition that in that kind of situation, the letters giving tax advice provided an indicia of reliability or indicia of legitimacy to an otherwise fraudulent scheme, and that people might have relied or did rely reasonably, arguably, on the legal advice included in there. I mean, the letters were intended for potential clients or customers to rely on them. That's a little different from our situation where the representations complained about are essentially factual in nature. I mean, you would conceive that that's a distinction, but you would say it doesn't make a difference, right? That's correct, Your Honor. The reason why I'd say it wouldn't make a difference in this particular situation is because the defendant widows rose to the same level. He didn't just give opinions. He gave stated facts to give a legal stamp of approval to everything, including how can you get away with saying the money's in my trust account when it isn't? I mean, that's an absolute... You'll have your rebuttal time. Thank you, Your Honor. I appreciate it. Good morning, Your Honors. Michelle Thomas on behalf of the defendants, Richmond Greer and John Whittles. I'm struck by opposing counsel's argument that he is kind of following the same approach that Mr. Toko has done for years in this case, and that is believing what they want to believe as opposed to what really happened. I think the record is very clear in this case, and Judge Edmonds had no difficulty in ferreting out the undisputed facts, and that is every statement in this case, oral and written, with the exception of the allegations regarding the placement of funds in the Richmond Greer trust account, were couched in future tense regarding an impending transfer of an expected inheritance. The concept that those very words, and they are said over and over and over again in the e-mails, in the text, it is clear that everybody was in the same waiting game in this case, including Mr. Zeta's attorneys here. And future promises simply do not rise to the level of fraud under Michigan laws. That is just well established. Well, the thread, at the risk of oversimplifying the thread that runs through what was done here, is that Whittles essentially was passing on information that he himself believed, and to some degree, at least financially, was a victim of all of this himself. The only question I have is whether any reasonable juror could have found to the contrary, whether this was really something that was properly disposed of by summary judgment. Again, Judge Guy, the record is perfectly clear. The burden of proof on Mr. Tocco was to prove by clear and convincing evidence that there was an intent to defraud on the part of Mr. Whittles. I mean, let's just focus on Mr. Whittles. He is the individual at the firm that had all the connections, communications. Well, that's the ultimate burden of proof if there is a trial. I'm not sure that characterization is appropriate in a summary judgment motion, though. He doesn't have a burden of proof in that sense at the summary judgment stage. Well, he does to the extent that he must create a prima facie case, and under Michigan law, a prima facie case requires clear and convincing evidence. And in this case, there was no evidence whatsoever of an intent to defraud. Mr. Whittles denied it, and the evidence that was submitted, the documentary evidence, corroborated that he honestly believed Mr. Zeta, his representations, that he merely was conveying them, that he did corroborate to the extent he was allowed to by his client. You know, again, I think it's the most critical factor here is Mr. Whittles was Joseph Zeta's attorney, and he was obligated to believe his client. He owed him that professional duty. The attorney-client privilege precluded him from sharing anything with Mr. Toko that Mr. Zeta did not allow to be shared, which was very, very little, no question about it. But I think the most critical fact is Mr. Toko and his attorneys were fully aware of the fact that Mr. Whittles' hands were tied. They acknowledged it. They accepted it. And along the entire way, Mr. Toko had his own attorneys. And Mr. Simchonowski, starting in 2007, before my clients ever became involved, encouraged Mr. Toko to sue Mr. Zeta, to not to wait. Don't believe him. You know, deadlines came and passed repeatedly, and Mr. Toko elected for whatever reason to continue to believe that Mr. Zeta would ultimately inherit this money and then pay him when there was no evidence that he had been presented other than continued failure on Mr. Zeta's part to come through. All Mr. Whittles was doing was conveying Mr. Zeta's representations to Mr. Toko. Mr. Whittles did not hold Mr. Toko's feet to the fire. He did not force him to refrain from filing suit. He did not force him to ignore his own attorney's advice repeatedly. That was Mr. Toko's own decision. So even if we get past the question of fact as to whether or not there were misrepresentations, which, again, the record does not substantiate whatsoever, the only allegations of present and existing fact relate to the allegations, the claims that Mr. Whittles at one point orally stated to Mr. Morgenrath and Mr. Simchonowski that the money was in the trust account and to Mr. Toko as well. Mr. Toko says that representation occurred at the private meeting that he had with Mr. Toko and Mr. Simchonowski on August 14th. Mr. Simchonowski, however, denied that Mr. Whittles ever said that. Mr. Toko admits that was his belief based on a letter that he had received dated August 8th. And by the way, that letter says we are still waiting and we have advised Mr. Zeta to continue to negotiate in order to get the entire settlement. There's no representation in that letter that the funds were in hand anywhere, let alone in the Richmond Girt Trust account. And then after that, within two weeks after that meeting, you've got an affidavit provided by Mr. Whittles which states that he doesn't have any funds yet and there's no guarantee he ever will. How could Mr. Toko possibly rely on his misunderstanding as to where those funds were in light of that evidence? And that affidavit was just one of several subsequent written communications that stated, we're still waiting for the funds, we believe they're coming, we don't have them. And even if you get past reasonable reliance, there's no causation here. There's no question in this case that Mr. Toko's damages arose because he failed to move forward and protect his own self-interest. He ignored his own attorney's advice. He refused to execute on a UCC claim that had been perfected, although apparently based upon Mr. Zeta's, again, misrepresentations, that these personal property items were unencumbered when in fact they were. They were held by a bank. And by 2007, again, before my clients ever became involved, Mr. Zeta had no assets. He had been sued. Within a year, there were judgments against him, ultimately over $60 million in consent judgments and default judgments by 2009. So even had he moved when he could have, there was nothing for him to collect. He was an unsecured creditor. And I think the Michigan law is very clear. This was an adverse relationship. Mr. Toko was owed money. He was a creditor. Mr. Zeta was his debtor. Mr. Toko had his own counsel. Mr. Zeta had Mr. Whittles. How they can possibly turn that into a non-adversarial relationship is beyond me. When you have not only adverse legal interest, you also have the adverse relationship between a borrower and a creditor. And the Michigan case law is very clear. Our courts will not put attorneys in that conflict of trying to represent people who are not aligned. And this is a classic case. Even if Mr. Toko wanted to believe Mr. Whittles, he had no business doing so. Mr. Whittles was not his fiduciary. His loyalty went to Mr. Zeta only. And he never crossed the line. That evidence is very clear. And unless there are any questions. Thank you. I think counsel read a different deposition of Mr. Simjanovski than I saw because Mr. Simjanovski did not tell him to file suit. What he told him one time was to collateralize, which he did. That's how he got collateral. And that was months before everything blew up. And, of course, the collateral turned out to be false too. So that's not really accurate. Also, Mr. Simjanovski was the object of these representations that were made in late 2008 where Mr. Whittles flew in on his own accord to convince everybody, including Mr. Simjanovski, that the monies were in a trust account, even put it in writing. I mean, what they're asking for here is immunity. What they're asking for is that a jury shouldn't decide fact situations. There are sufficient facts in order to go to a jury. And the problem here is what they're saying. Well, somehow, no matter what the facts are, no matter how many times he misrepresented, no matter when he misrepresented as to the truth, no matter even though he misrepresented that he did his due diligence, which he didn't do at all, Mr. Whittles, he's immune somehow because he's a lawyer that represents the other party. That's not what the law says. The law doesn't say that you're immune. The law says you have to have facts that can go to a jury. That we have. And what they're taking from the jury is the right to decide, and they're taking from the plaintiff that right to have a jury trial and a trial on the facts. And everything that Mr. Zeta represented, Mr. Whittles specifically identified and stated that he independently verified and confirmed every statement by Mr. Zeta as to his inheritance, the monies, trust account, everything. He also testified that the monies that being in the trust account he did represent to the plaintiff. And how do you tell somebody the money is there in the trust account when it isn't true and think that you're going to be somehow immune from liability when somebody relies upon that? Those were present representations. And at one time, he actually sends a written document and says, give me your street address. I have confirmation that the funds are in place and ready to wire. That's right near the end. But, of course, they weren't ready to wire. They weren't in place. I think I'm out. Thank you very much. Time to vote for your argument, and we'll consider the case carefully. Thank you.